UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
LISA NG and CHARMING TRADING
COMPANY,

                    Appellants,             <u>MEMORANDUM & ORDER</u>
                                            13-CV-5053(JS)

          -against-

STEWART ADLER,

                    Appellee.
----------------------------------------X
STEWART ADLER,

                    Appellant,

          -against-

LISA NG and CHARMING TRADING
COMPANY,

                    Appellees.
----------------------------------------X
APPEARANCES
For Ng & Charming    Bradford D. Conover, Esq.
Trading:             Conover Law Offices
                     345 Seventh Avenue, 21st Floor
                     New York, NY 10001

                     David H. Wander, Esq.
                     Davidoff Hutcher & Citron
                     605 Third Avenue, 34th Floor
                     New York, NY 10158

For Adler:           Richard Braverman, Esq.
                     Braverman Law Office PC
                     585 Stewart Avenue, Suite 528
                     Garden City, NY 11530


SEYBERT, District Judge:

          Currently pending before the Court are appeals from

Lisa Ng and Charming Trading Company ("Ng and Charming Trading"

or "Plaintiffs") and from Stewart Adler ("Adler" or "Debtor") arising out of a Chapter 7 bankruptcy action filed in the United States Bankruptcy Court for the Eastern District of New York. For the following reasons, Plaintiffs' appeal and Adler's appeal are both DENIED and the Bankruptcy Court's holdings are AFFIRMED.

<u>BACKGROUND</u>

On July 25, 2003, Plaintiffs filed a complaint against Adler and corporations owned by Adler (the "Corporations")[1] in the Supreme Court of the State of New York, County of New York (the "State Court Lawsuit"). Plaintiffs asserted claims based on breach of contract, fraud, and piercing the corporate veil. During the pendency of that action, on July 28, 2004, Adler filed a petition for relief under Chapter 7 with the United States Bankruptcy Court for the Eastern District of New York.

As a result of Adler's Chapter 7 petition, the State Court severed and stayed the State Court Lawsuit against him but allowed it to proceed against the Corporations. The State Court ultimately found the Corporations liable on the fraud and contract claims, and then held a six-day inquest on damages. On September 14, 2005, the State Court entered a judgment against

---

[1] Adler was the sole owner of J.U.N.K. Jeanswear Corporation, Just Jeanswear Corporation, Just Jeanswear Corporation II, Just Jeanswear Corporation III, and Seruchi Jeanswear Corporation.

the Corporations and in favor of Plaintiffs in the amount of $2,025,849.97.

On April 25, 2005, Plaintiffs commenced an adversary proceeding against Adler in connection with the bankruptcy action by filing a complaint: (1) "seeking to have their claims deemed non-dischargeable, pursuant to §§ 523(a)(2)(A), (a)(4), and (a)(6) of the Bankruptcy Code;" and (2) "objecting to the Debtor's discharge, pursuant to §§ 727(a)(2), (a)(3), (a)(4)(A) and (a)(5) of the Bankruptcy Code." (Pls.' Opp. Br., Docket Entry 13, at 2-3.) Plaintiffs also included a claim for piercing the corporate veil. On December 18, 2006 Plaintiffs moved for summary judgment related to the §§ 523(a)(2)(A) and § 727(a)(4) actions, which was granted on June 13, 2007. On June 22, 2007, Adler appealed that decision to the United States District Court for the Eastern District of New York. The District Court reversed the summary judgment order and remanded the case for further proceedings on the merits.

On September 14, 2010, "Plaintiffs filed a motion in limine seeking to preclude [Adler] from relitigating issues relating to the Corporations that were decided in the State Court lawsuit." (Pls.' Opp. Br., at 3.) Trial began on September 20, 2010 and continued for seven nonconsecutive days, concluding on February 3, 2011. On March 2, 2012 the Bankruptcy Court issued its first decision "find[ing] that the corporate

veil should be pierced and [Adler] held liable for the Corporations' obligations to the Plaintiffs." In re Adler, 467 B.R. 279, 297 (E.D.N.Y. 2012).

On July 11, 2013, the Bankruptcy Court issued its second decision which denied Adler's discharge pursuant to §§ 727(a)(2)(A), (a)(3), (a)(4)(A), and (a)(5) of the Bankruptcy Code. It also sua sponte held that the automatic stay pursuant to 11 U.S.C. § 362 applied retroactively to the Corporations. Therefore, the Bankruptcy Court found that the State Court judgment violated the automatic stay and was void ab initio. In re Adler, 494 B.R. 43, 59 (E.D.N.Y. 2013).

On July 24, 2013, Plaintiffs filed a notice of appeal with respect to the July 11, 2013 Order. Adler also filed a notice of appeal from the portion of the July 11, 2013 Order denying discharge as well as from the March 2, 2012 piercing the corporate veils.

On August 26, 2013, the Bankruptcy Court denied Plaintiff's motion in limine, and again declared the State Court judgment void ab initio. Plaintiffs amended their notice of appeal accordingly.

DISCUSSION

Plaintiffs' and Adler's appeals are now pending. The Court will first address the applicable legal standard before turning to the merits of each of the appeals.

4

I. Legal Standard

Federal district courts have jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges. FED. R. BANKR. P. 8013. The Bankruptcy Court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." Id.; see also Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.), 25 F.3d 1132, 1136 (2d Cir. 1994). The Bankruptcy Court's legal conclusions, however, are reviewed de novo. See Momentum Mfg. Co., 25 F.3d at 1136.

II. Adler's Appeal

A. Appeal of the March 2, 2012 Order Piercing the Corporate Veil

Adler maintains that the Bankruptcy Court erred in its March 2, 2012 Order, in which the Bankruptcy Court pierced the corporate veil and found that Adler could be held liable for the debts of the Corporations. See In re Adler (the "Piercing Order"), 467 B.R. 279 (Bankr. E.D.N.Y. 2012). The Court disagrees.

In order to pierce the corporate veil, a party must demonstrate that "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong

against the plaintiff which resulted in plaintiff's injury."
Mars Electronics of N.Y., Inc. v. U.S.A. Direct, Inc., 28 F.
Supp. 2d 91, 97 (E.D.N.Y. 1998) (internal quotation marks and
citations omitted); accord First Keystone Consultants, Inc. v.
Schlesinger Elec. Contractors, Inc., 871 F. Supp. 2d 103, 124
(E.D.N.Y. 2012). In determining domination, courts consider,
inter alia, the following factors:

> (1) whether corporate formalities are
> observed, (2) whether the capitalization is
> adequate, (3) whether funds are put in and
> taken out of the corporation for personal
> rather than corporate purposes, (4) whether
> there is overlap in ownership, officers,
> directors, and personnel, . . . [5] whether
> the corporation is treated as an independent
> profit center, [and] [6] whether others pay
> or guarantee debts of the dominated
> corporation . . . .

Mars Elecs. of N.Y., Inc., 28 F. Supp. 2d at 97-98 (quoting Am.
Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir.
1997)).

"'[T]here is no set rule as to how many . . . factors
must be present in order to pierce the corporate veil.'" Fed.
Nat'l Mortg. Ass'n v. Olympia Mortg. Corp., 724 F. Supp. 2d 308,
319 (E.D.N.Y. 2010) (quoting William Wrigley Jr. Co. v. Waters,
890 F.2d 594, 600-01 (2d Cir. 1989) (alterations in original)).
The Court will consider each of these factors in turn.

1. <u>Corporate Formalities</u>

Adler proffers a litany of ways in which corporate formalities were observed. For example, he asserts that each corporation was separately incorporated by an attorney, each corporation had a separate bank account bearing the name of the corporation, each corporation had separate checks which bore the full corporate name, only the Corporations paid Plaintiffs, each corporation had separate factoring agreements with separate account numbers, each corporation received separate monthly factoring statements from the factor, each corporation had its own employer identification number, each corporation had its own letterhead, each corporation received separate invoices under its separate corporate name, each corporation issued separate invoices under its own corporate name, and each corporation issued separate purchase orders. (Adler's Appellant Br., Docket Entry 10, at 21-23.) Adler also asserts that the Corporations hired a bookkeeper and a Certified Public Accountant ("CPA").[2] (Adler's Appellant Br. at 24.) Plaintiffs argue that Adler admitted that stock certificates were never issued, and that he failed to retain the original corporate kits. (Pls.' Opp. Br. at 10.) Plaintiffs further assert that Adler could not produce

---

[2] The Court's characterizations of Adler's arguments are based upon its reading of Adler's Appellant Brief. However, the brief discusses the issue of piercing the corporate veil for more than twenty pages without specifically defining which element or elements it seeks to address.

contemporaneous financial records, that tax returns were never prepared for some Corporations, and that some tax returns were prepared long after the Corporations ceased operations. (Pls.' Opp. Br. at 10.) The Court finds that the Bankruptcy Court did not err in holding that the lack of corporate formalities weighed in favor of piercing the corporate veil.

The Bankruptcy Court fully addressed the same issues Adler now raises before this Court. In fact, these issues were not questioned. Rather, Judge Grossman noted that the contemporaneous financial reports that Adler contended were prepared by the Corporations' bookkeeper were never produced. Piercing Order, 467 B.R. at 287. He further held that "while the evidence shows that the Corporations did keep separate accounts and separate factoring agreements, the evidence also shows that the Debtor, at times, directed the invoices of one Corporation to be paid by another, and the overhead for all of the Corporations, at times, to be paid by a single Corporation." Id. at 288 (internal citation omitted).

The Bankruptcy Court based its decision directly upon Adler's testimony as well as the testimony of Certified Public Accountant Michael Portnoy's and the documentary evidence. Moreover, actions such as inadequate record keeping, lack of corporate kits, and failure to comply with governmental requirements--such as taxes--are the very types of corporate

formalities that courts analyze in considering this factor.  See
Fed. Nat'l Mortg. Ass'n, 724 F. Supp. 2d at 318 ("Olympia lacked
many of the formalities of corporate existence, including . . .
keeping of complete and accurate official corporate records.");
DER Travel Servs., Inc. v. Dream Tours & Adventures, Inc., No.
99-CV-2231, 2005 WL 2848939, at *11 (S.D.N.Y. Oct. 28, 2005)
(finding a lack of corporate formalities, in part, due to a
failure to file corporate tax returns); see also Nat'l
Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp., 938
F. Supp. 2d 361, 376 n.11 (E.D.N.Y. 2013) (informal sessions
with an accountant were insufficient to constitute corporate
formalities).  In fact, courts provide such actions as examples
of the definition of corporate formalities.  See, e.g., In re
Montclair Homes, 200 B.R. 84, 99 (Bankr. E.D.N.Y. 1996) (giving
maintenance of corporate records as an example of a corporate
formality).  As such, this Court finds that the corporate
formalities factor weighs in favor of piercing the corporate
veil and that Adler's appeal in this regard is without merit.

    2. Inadequate Capitalization

    Adler next asserts that the Corporations were not
undercapitalized because they were financed by purchase order
financing agreements.  (See, e.g., Adler's Appellant Br. at 20,
22.)  Plaintiffs argue that Adler admitted that he never
invested any money or capital in the Corporations between 1997

and 2000 and that factor financing is not capital. (Pls.' Opp. Br. at 11.) The Court finds that this factor also weighs in favor of piercing the corporate veil.

The Bankruptcy Court held that, while it was undisputed that the Corporations were funded by factor financing, financing is not the same as capital. Piercing Order, 467 B.R. at 289-90 (citing Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.3d 131, 139-40 (2d Cir. 1991)). The Bankruptcy Court also found that Adler's start up contributions did not constitute capital and rejected Adler's argument that Plaintiffs knew or should have known about the Corporations' financing. Id. at 290.

Adler cites no cases holding that factoring agreements or financing are sufficient to show capital. Though there are few cases on this issue specifically, Passalacqua and the Court's independent research confirm that capital requires something more than financing or loans. See Wm. Passalacqua Builders, Inc., 933 F.2d at 139-40 (finding that loans and financing demonstrated inadequate capitalization); Northern Tankers (Cyprus) Ltd. v. Backstrom, 967 F. Supp. 1391, 1403 (D. Conn. 1997) (finding inadequate capitalization where the capitalization "was in virtually all instances strictly nominal, and the various entities survived almost entirely on 'loans' and personal guarantees").

10

Furthermore, even assuming that Plaintiffs had some knowledge of the Corporations' general financing structures, there is nothing to indicate that they had any idea that the Corporations were shell corporations or that they were inadequately capitalized. Contra Lakah v. UBS AG, 996 F. Supp. 2d 250, 268 (S.D.N.Y. 2014) (the respondents investigated the business to determine whether they could meet financial obligations and documents made clear that the issuer was a shell company).

Thus, the Court finds that this factor also weighs in favor of piercing the corporate veil and that Adler's appeal in this regard is without merit.

### 3. Personal Use of Corporate Assets

Adler next contends that, although corporate monies were sent to his wife, Cindy Speiser's, bank account, this was because Ms. Speiser would "lay out money for the Corporations," and the Corporations would repay her. (Adler's Appellant Br. at 30-31.) He asserts that all expenses were paid to her and properly noted in the Corporations' books. In fact, he contends that Plaintiffs "failed to demonstrate any misappropriation of the Corporations' funds; nor did [Plaintiffs] show that Adler ever used any of the Corporations' property for his own." (Adler's Appellant Br. at 31.) Plaintiffs point out that no

records showed that the transfers to Ms. Speiser's account were for valid corporate expenses. (Pls.' Opp. Br. at 12-13.)

The Bankruptcy Court actually acknowledged--and agreed--with Adler's current argument that the evidence did not show one way or the other whether the funds sent to Ms. Speiser's account were used for personal expenses. Piercing Order, 467 B.R. at 291. Rather, Judge Grossman held that "the arrangement with Ms. Speiser does demonstrate the Corporations' failure to observe the most fundamental corporate formalities." Id.

Thus, it is not clear what Adler is appealing in this regard. The Bankruptcy Court never held that Adler used the money in Ms. Speiser's account for personal reasons. Moreover, Adler does not seem to dispute that the use of personal bank accounts can demonstrate a lack of corporate formalities, nor can he. See Nat'l Integrated Grp. Pension Plan, 938 F. Supp. 2d at 377 ("Even if the Court accepts Thaw's claim that he reimbursed the companies for the majority of his personal expenses, his use of corporate credit cards to pay over $300,000 in personal expenses is evidence of domination."); First Keystone Consultants, Inc., 871 F. Supp. 2d at 126 (holding that even accepting the plaintiffs' explanations on certain factors, this would still indicate domination).

Accordingly, the Court finds that Adler's appeal is meritless in this regard.

### 4. Overlap in Ownership, Officers, and Directors

The Bankruptcy Court found that this factor is neutral and not applicable. <u>Piercing Order</u>, 467 B.R. at 291. As such, it does not appear that Adler raises this as a specific ground for appeal.

### 5. Independent Profit Centers

Here, as before the Bankruptcy Court, Adler argues that the Corporations were treated as independent profit centers because they operated in a manner typical in the garment industry, the Corporations' factors kept a close watch on the Corporations, transactions were noted and recorded, and there were no irregularities in purchase orders. (<u>See</u> <u>generally</u> Adler's Appellant Br.) Plaintiffs counter that Adler only conclusorily asserts that the Bankruptcy Court erred without disputing the Bankruptcy Court's factual findings. (Pls.' Opp. Br. at 15.) The Court agrees with Plaintiffs.

The Bankruptcy Court held that

> [w]hether the Corporations were treated as independent profit centers with respect to each other is not the critical issue. The Plaintiffs are seeking to pierce the corporate veil to hold the Debtor liable for Corporations' debts, not to hold each of the Corporations liable for the debts of the other.

_Piercing Order_, 467 B.R. at 292.  The Bankruptcy Court went on to say that Adler admitted that he assured Plaintiffs that they would be repaid and that the evidence demonstrated that Adler allocated invoices and shifted liabilities among the Corporations without regard to which Corporation issued the original purchase order.  Contrary to Adler's assertions, the Bankruptcy Court cited various exhibits and provided specific examples and did not ignore any testimony.

Adler's use of cross-guarantees across the Corporations demonstrates domination and shows that the Corporations were not independent profit centers.  Although Adler asserts that the Corporations could not split purchase orders, invoices, or accounts receivable or choose which Corporation would pay (Adler's Appellant Br. at 26), cross-guarantees show interchangeability of the Corporations.  _See, e.g._, _D. Klein & Son, Inc. v. Good Decision, Inc._, 147 F. App'x 195, 198 (2d Cir. 2005) (finding that the businesses did not operate as independent profit centers because the entities were used interchangeably).

Given Adler's conclusory assertions on this factor and the Court's review, the Court finds that this factor weighs in favor of piercing the corporate veil.

6. Adler Guaranteed the Debts of the Corporations

Adler further disputes that he personally guaranteed the relevant debts and maintains that the Corporations made the guarantees.  (Adler's Appellant Br. at 32-33.)  Plaintiffs cite to several handwritten letters from Adler in which he used the word "I" in making guarantees, thus indicating that Adler personally guaranteed the debt.  (Pls.' Opp. Br. at 15-17.)

The Bankruptcy Court held that "when considered in the context of the Plaintiffs' efforts to pierce the corporate veil, the Debtor's promise to pay, whether individually or by the Corporations as a whole, is persuasive evidence of the Debtor's domination of the Corporation and weighs in favor of piercing." Piercing Order, 467 B.R. at 294.

Thus, contrary to Adler's assertion, the Bankruptcy Court did not make any definitive statement that Adler's personal guarantees supported piercing the corporate veil. Rather, the Bankruptcy Court held that the promises to pay, whether by Adler or the Corporations, showed domination.  The Bankruptcy Court's decision is supported by precedent and in fact incorporated into the element itself.  See Lakah, 996 F. Supp. 2d at 263 (holding that personal guarantees--and presumably company guarantees as well--"strengthen the inference of domination"); In re Oko, 395 B.R. 559, 563-64 (Bankr. E.D.N.Y. 2008) (making clear that this factor considers guarantees "by the owners or by another related corporation").

Accordingly, Adler's appeal in this regard is meritless.

### 7. Fraud or Wrong Against Plaintiffs

Thus, having found that the factors demonstrate Adler's domination, the Court turns to whether Adler used such domination to commit a fraud or wrong against Plaintiffs which resulted in Plaintiffs' injury. Adler makes a litany of arguments, but it is unclear in exactly what ways he attacks this prong of the analysis. As best the Court can discern, Adler argues that Ng is a sophisticated businesswoman who was well aware that the Corporations were financed by factors and Letter of Credit Financing. (Adler's Appellant Br. at 32.) He also asserts that the Corporations simply lost money--mainly due to "bad fit" products that Plaintiffs provided--and that the fact that Adler sometimes used the pronoun "I" with Plaintiffs when referring to promises to pay cannot be the basis to pierce the corporate veil. (Adler's Appellant Br. at 32-33.) Plaintiffs argue that the documentary evidence established that Adler made various misrepresentations to Plaintiffs to induce them to continue shipping goods. (Pls.' Opp. Br. at 18.)

The Bankruptcy Court noted that it was unclear "how it came to be that Charming Trading issued invoices to the Corporations, despite its alleged role as agent of the Corporations." Piercing Order, 467 B.R. at 295. Nonetheless,

the Bankruptcy Court made several findings of fact. First, the Bankruptcy Court found that Adler had contradicted his own testimony that it was Ng who decided to issue invoices to the Corporations. Id. Second, the Court found that the evidence tended to show that Adler and the Corporations did not interact with Plaintiffs in a principal/agent-type of relationship. Id. Moreover, any involvement with other manufacturers was de minimis and could not support Adler's hope that he/the Corporations would be able to pay Plaintiffs back. Id. at 296. Ultimately, the Bankruptcy Court held that, "[a]lthough it may have been the Debtor's earnest intention that the Corporations would repay the Plaintiffs, that intention was not supported by any financial reality." Id. at 297.

To the extent that Adler challenges the Bankruptcy Court's findings of fact, the Court here finds no clear error. Just as Adler proffered contradictory testimony before the Bankruptcy Court--which Judge Grossman cited to specifically throughout his opinion--even the briefs before this Court invite suspicion as to why Plaintiffs issued invoices to the Corporations and why the Corporations purported to be liable to the manufacturers but also believed Plaintiffs to be responsible for repayment.

In any event, under a de novo review of the legal issues, the Court finds that Adler committed an unjust act

towards Plaintiffs. Specifically, Adler's promises, even if on behalf of the Corporations, were the only reason proffered as to why Plaintiffs paid for goods to the Chinese manufacturers and invoiced Adler and the Corporations later. Plaintiffs then could not make those payments, resulting in significant injury. Adler's actions need not necessarily be fraudulent so long as they were wrong or unjust. See V.F. Garment, Inc. v. Seaboard Atl. Garment, Inc., No. 05-CV-1137, 2009 WL 2982985, at *1 (N.D.N.Y. Sept. 14, 2009) (allegations of a wrongful act were sufficient where actions were taken with knowledge or reckless disregard); see also First Keystone Consultants, Inc., 871 F. Supp. 2d at 127 (despite arguments that the relevant parties did not engage in fraud or intend to engage in fraud, the court granted summary judgment against them because domination caused diversion of funds and, therefore, injury). Moreover, whether the products were ultimately of poor quality is somewhat of a distraction from the main issue that Adler's domination caused Plaintiffs' inability to pay. See In re Oko, 395 B.R. at 565 ("If a company is unable to pay the debts, claims, and obligations pending against it due to an individual's domination of the business, then a plaintiff has likely been injured.").

Accordingly, the Court finds that piercing the corporate veil was appropriate and Adler's appeal in this regard is DENIED.

B. <u>Appeal of the July 11, 2013 Decision Denying Discharge</u>

Adler also appeals the Bankruptcy Court's July 11, 2013 Order (the "July Order"), in which it denied Adler a discharge under various subsections of 11 U.S.C. § 727. See In re Adler (July Order), 494 B.R. 43 (Bankr. E.D.N.Y. 2013).

"The relief of discharge is a cornerstone of the debtor's 'fresh start' in bankruptcy. It enables the debtor to begin his post-bankruptcy life with a clean slate vis-à-vis his creditors." Helms v. Gangemi (In re Gangemi), 291 B.R. 242, 246 (Bankr. E.D.N.Y. 2003) (quoting Aid Auto Stores, Inc. v. Pimpinella (In re Pimpinella), 133 B.R. 694, 697 (Bankr. E.D.N.Y. 1991)). This relief however is a privilege, not a right, and only the "honest but unfortunate debtor" is entitled to it. Walters v. Sawyer (In re Sawyer), 130 B.R. 384, 392 (Bankr. E.D.N.Y. 1991) (quoting Grogan v. Grogan, 498 U.S. 279, 287, 111 S. Ct. 654, 659, 112 L. Ed. 2d 755 (1991)). Thus, § 727(a) of the Bankruptcy Code provides various grounds for denying the discharge of a dishonest or otherwise unworthy debtor, which must be construed liberally in favor of the debtor. See Gangemi, 290 B.R. at 246; Krohn v. Frommann (In re Frommann), 153 B.R. 113, 116 (Bankr. E.D.N.Y. 1993)

In the July Order, the Bankruptcy Court held that Adler was not entitled to a discharge pursuant to Section 727(a)(2)(A), 727(a)(3), 727(a)(5), and 727(a)(4)(A). The Court

will separately consider Adler's appeal as to each of these subsections.

### 1. Section 727(a)(2)(A)

Section 727(a)(2)(A) provides that "[t]he court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate . . . has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition."  11 U.S.C. § 727(a)(2)(A).

Adler asserts that salary payments from the Corporations to him that were deposited into his wife's account were noted in the books of the Corporations and picked up as income by Adler.  (Adler's Appellant Br. at 36.)  Thus, the payments were not expenses of the Corporations.  In addition, some payments were made to Ms. Speiser to reimburse her for loans to the Corporations.  (Adler's Appellant Br. at 36.) Adler did not consider these to be transfers, and all expenses paid to Ms. Speiser were properly documented and recorded. (Adler's Appellant Br. at 37.)  Moreover, Portnoy testified that approximately $3.1 million came in to the Corporations and $3.1 million went out.  (Adler's Appellant Br. at 37.)  Therefore, Adler argues that Plaintiffs did not demonstrate that he transferred, removed, destroyed, mutilated or concealed his

property within one year before filing the petition nor did they show any fraud.  Plaintiffs cite to the July Order and notes that, while Adler does not deny the facts upon which the Bankruptcy Court relied, he makes three meritless arguments. (Pls.' Opp. Br. at 25-26.)

In the July Order, Judge Grossman initially noted that, because the Corporations did not have an independent identity, Adler, "in his individual bankruptcy petition, must have accounted for any endeavor by, and any property of, the Corporations in order to avoid denial of his discharge pursuant to Section 727(a)." July Order, 494 B.R. at 61.  The Bankruptcy Court then went on to address Section 727(a)(2)(A) specifically. First, it held that property held in Ms. Speiser's account and in an account maintained in Stewart Sourcing & Manufacturing Company, Inc. ("Stewart Sourcing") were property of Adler.  Id. at 62-63.  The Court also held that approximately $3 million obtained by the Corporations through the sales of accounts receivable were property of Adler and the Corporations.  Id. at 63.

Second, the Bankruptcy Court found that Adler concealed property within one year before filing his petition by testifying at the statutorily mandated meeting of the creditors that his companies "never made payments to his family members" despite his later acknowledgement before the Bankruptcy Court

that he wrote several checks on behalf of the Corporations to Ms. Speiser's account. Id. at 63-64. Adler further failed to disclose these assets in Schedule B of the petition. Id. at 64. In addition, Adler concealed property by keeping fourteen boxes of corporate records in his garage for years prior to the petition's filing. Id. at 64-65.

Finally, the Bankruptcy Court held that Adler offered false or misleading answers and data regarding his property with the intent of preventing its discovery. For example, transferring funds to Ms. Speiser's account and/or to Stewart Sourcing, without any loss of control over those funds, constituted one or more "badges" of fraud.

As the July Order properly noted:

> To meet the burden encoded in [Section 727(a)(2)(A)], a plaintiff must prove four elements: (1) the property "transferred, removed, destroyed, mutilated, or concealed" was "property of the debtor," and (2) the debtor committed one of these five "improper act[s]" within (3) one year of filing and (4) with "a subjective intent to hinder, delay, or defraud a creditor."

Id. at 62 (second alteration in original) (quoting In re Boyer, 328 F. App'x 711, 714 (2d Cir. 2009). Here, the Court agrees with Plaintiffs that Adler does not seem to dispute the facts upon which the Bankruptcy Court relied. In fact, the Bankruptcy Court repeatedly cited Adler's own testimony that he used Ms. Speiser's account, and did so at least in part for the purpose

of avoiding taxes.  Id. at 66.  Rather, Adler seems to be appealing only that portion of the Bankruptcy Court's opinion finding that Adler had a fraudulent intent.

"Since fraudulent intent is rarely subject to direct proof, [courts] look to circumstantial 'badges of fraud to establish the requisite actual intent to defraud.'"  In re Boyer, 328 F. App'x at 715 (quoting Salomon v. Kaiser (In re Kaiser), 722 F.2d 1574, 1582 (2d Cir. 1983)).  There are several badges of fraud, including "the retention of possession, benefit or use of the property in question."  Id. at 715 n.2 (listing five other badges of fraud).

"A classic example of fraud is '[t]he transfer of property by the debtor to his spouse while insolvent, while retaining the use and enjoyment of the property.'"  In re Pisculli, 426 B.R. 52, 67 (Bankr. E.D.N.Y. 2010) (quoting In re Kaiser, 722 F.2d at 1583).  This is just such the case here. Adler admitted to transferring funds to Ms. Speiser and that Ms. Speiser would use the funds for, among other things, Adler's personal expenses at his direction.  See July Order, 494 B.R. at 66 (quoting specific trial testimony).  This constitutes fraud. See In re Vidro, 497 B.R. 678, 688 (Bankr. E.D.N.Y. 2013) (finding intent where the defendant transferred funds to his wife's account, over which he had control); In re Pisculli, 426 B.R. at 67 ("Appellant's transfer of the truck proceeds to his

wife, who placed those funds in her personal bank account and used at least a portion of those funds for her and appellant's personal use, implicates this indicia of fraud.").

Given such facts, particularly in conjunction with the other evidence and the Bankruptcy Court's undisputed factual findings, this Court is confident that the Bankruptcy Court did not err. See In re Russell, 507 B.R. 786, 794 (Bankr. N.D.N.Y. 2014) (finding an improper intent where, among other things, the debtor did not account for funds and did not amend her schedules). Accordingly, Adler's appeal in this regard is DENIED.

2. Section 727(a)(3)

Adler next contends that the Bankruptcy Court erred in denying him a discharge pursuant to Section 727(a)(3). Section 727(a)(3) provides that

> the court shall grant the debtor a discharge, unless the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).

Adler asserts that Plaintiffs did not satisfy their burden under this subsection because Adler provided hundreds of

pages of documents to the Trustee and to Plaintiffs' counsel, Adler turned over boxes in his garage as soon as he discovered them, and that any additional documents were left behind in haste when he was forced to leave his office space quickly. (Adler's Appellant Br. at 39.) He further asserts that the Bankruptcy Court relied upon a missing sum of between $80,000 and $90,000, even though this sum referred to monies that would have been paid to a supplier rather than the Corporations. (Adler's Appellant Br. at 40.) As such, Adler argues that the Bankruptcy Court erred: (1) in finding that he was a "sophisticated debtor" who should be held to a higher level of record keeping, (2) in finding that Adler concealed the documents there were in his garage, and (3) in finding that the Corporations' records were inadequate. (Adler's Appellant Br. at 40.)

Plaintiffs assert that Adler's characterization of the record is at odds with the documentary evidence and Portnoy's testimony. As to whether Adler is a sophisticated debtor, Plaintiffs assert that although Adler points to some letters to demonstrate that he is not sophisticated in the relevant sense, he does not identify those letters or explain how they show that he was not sophisticated. Plaintiffs additionally argue that Adler's contention that he produced hundreds of pages of documents which explained all of his finances is contradicted by

the overwhelming evidence in the record that the Bankruptcy Court cited in its decision.  Similarly, Adler's contention that Portnoy offered unrebutted testimony which adequately explained Adler's and the Corporations' finances is contradicted by the overwhelming evidence in the record cited by the lower court.

The Bankruptcy Court held, first, that Plaintiffs satisfied their prima facie case showing the insufficiency of Adler's record-keeping.  It found that Adler was a sophisticated businessman due to his own testimony regarding business experience and that, therefore, Adler was subject to greater responsibility to maintain records than an unsophisticated debtor.  July Order, 494 B.R. at 68.  The Court also found that a sum of $80,000 to $90,000 had been distributed without any records.  Id.  In addition, Judge Grossman held that Portnoy's testimony demonstrated, inter alia, that the invoices were incomplete and that the ledgers Portnoy created were based on incomplete and selectively chosen documentary support resulting in only a generalized ledger with approximations and estimates. Id. at 68-69.

The Bankruptcy Court next concluded that Alder did not justify the absence of comprehensive records.  It held that Alder's stated justification did not meet his burden because "his conduct was not 'what a normal, reasonable person would do under the circumstances.'"  Id. at 70 (quoting D.A.N. Joint

Venture v. Cacioli (In re Cacioli), 332 B.R. 514, 518 (Bankr. D. Conn. 2005)).  For example, a reasonable person would not ask an accountant to recreate documents ex post facto.  Id.  Moreover, a debtor cannot defend his records' inadequacy by hiring an accountant to reconstruct records based on estimates.  Id. at 71.  Nor can a debtor "'simply place sacks of records before the judge or trustee to sift through documents and attempt to reconstruct the flow of the debtor's assets.'"  Id. (quoting In re Frommann, 153 B.R. at 118).  Nonetheless, the Court found that Adler "did exactly that in November 2010, giving Mr. Portnoy no less than fourteen boxes from which he could find supporting documentation for a single schedule."  Id.

     "The fundamental policy underlying § 727(a)(3) is to insure that the trustee and the creditors receive sufficient information to enable them to trace the debtor's financial history, to ascertain the debtor's financial condition, and to reconstruct the debtor's business transactions."  In re Sethi, 250 B.R. 831, 837-38 (Bankr. E.D.N.Y. 2000).  "If a debtor fails to produce records, sufficient to meet the burden placed upon him by § 727(a)(3), the Court must deny the discharge."  Gangemi, 291 B.R. at 246.

     In determining whether discharge should be denied pursuant to § 727(a)(3), the Court must engage in a two-step analysis.  First, the Court must determine whether the Debtor's

records present a complete and accurate picture of the Debtor's financial condition and business transactions. See In re Jacobowitz, 309 B.R. 429, 436 (Bankr. S.D.N.Y. 2004) ("[T]he objecting party [must] demonstrate[] that the debtor's failure to keep records has made it impossible to ascertain the debtor's financial condition and material business trans-actions . . . ."); Gangemi, 291 B.R. at 246 (same). The burden of proving the adequacy of the debtor's records rests with the party objecting to discharge. See Sethi, 250 B.R. at 838. Second, the Court must determine if the debtor's failure to maintain and produce adequate records is justified. See Jacobowitz, 309 B.R. at 436. The burden shifts to the debtor to justify the absence of comprehensive records. See Pimpinella, 133 B.R. at 698.

Here, the Court finds that Adler was indeed a sophisticated debtor. The Bankruptcy Court was certainly free to reject Adler's assertion that he is unsophisticated based upon the actual evidence in the record. In re Nemes, 323 B.R. 316, 328 (Bankr. E.D.N.Y. 2005) (finding the debtor's arguments as to sophistication unpersuasive because they were contradicted by record evidence). Evidence, such as Adler's own testimony that he is experienced in the business is sufficient to show sophistication. See, e.g., id. (citing, at least in part, to the debtor's employment and business experience).

This Court also finds that the Bankruptcy Court did not err in finding that Adler did not provide records regarding distribution of $80,000 to $90,000 earned by one or more of the Corporations. Adler cites to trial testimony to demonstrate that the sum was not earned by any Corporation, but rather was money owed to a supplier. (Adler's Appellant Br. at 40.) In that testimony, Adler stated that he did approximately $80,000 to $90,000 of business with a supplier called O Sport. (2/3/11 Trial Tr., Docket No. 13-CV-5054, Docket Entry 1-10, at 123.) Adler specifically testified that he was "guesstimating" and could not provide an exact number. (2/3/11 Trial Tr. at 123-24.)

Contrary to Adler's assertion, this testimony does not demonstrate that the $80,000 to $90,000 was owed to the supplier as opposed to a Corporation's earnings. It indicates only that the Corporations did approximately that amount of business with O Sport. In any event, the Bankruptcy Court was not clearly erroneous in concluding that this ambiguous testimony, in conjunction with the lack of banking records for three of the five Corporations, indicated that such a sum of money had not been accounted for or reflected in the records. See July Order, 494 B.R. at 68.

As to the adequacy of the records, this Court finds that the records were indeed inadequate. A party objecting to

discharge under § 727(a)(3) must show, by a preponderance of the evidence, that: (1) the debtor failed to keep or preserve adequate records; and (2) "'that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions.'" Jacobowitz, 309 B.R. at 436 (quoting Meridian Bank v. Alten, 958 F.2d 1226, 1230 (3d Cir. 1992)). A record's adequacy takes into consideration:

> whether a debtor was engaged in a business and, if so, the complexity and volume of the business; the amount of the debtor's obligations; whether the debtor's failure to keep or preserve books and records was due to the debtor's fault; the debtor's education, business experience and sophistication; the customary business practices for record keeping in the debtor's type of business; the degree of accuracy disclosed by the debtor's existing books and records; the extent of any egregious conduct on the debtor's part; and the debtor's courtroom demeanor.

In re Frommann, 153 B.R. at 117. This determination "is particularly fact intensive and must be decided on a case by case basis." In re Henderson, 423 B.R. 598, 617 (Bankr. N.D.N.Y. 2010).

Here, the Bankruptcy Court painstakingly combed through, and cited, Portnoy's testimony, in which Portnoy made clear that the records were incomplete. See July Order, 494 B.R. at 68-69. Adler does not necessarily dispute--nor can he-- that Portnoy "described his own sampling as small, the Debtor's

invoices as incomplete, and his use of these invoices as selective." Id. at 69 (citing various testimony). Where such is the case, courts have consistently found a discharge under Section 727(a)(3) to be unwarranted. See, e.g., In re Mitsopoulos, 487 B.R. 604, 612-13 (Bankr. E.D.N.Y. 2013) (denying discharge where journals reflected only cumulative business activities without identifying individual business transactions); In re Nemes, 323 B.R. at 326-27 (denying discharge where the debtor produced incomplete credit card records).

Given the records and the factors enumerated above, the Court finds that the records were incomplete. Here, the business was relatively complex and likely involved a significant amount of transactions and obligations, Adler had some records but not others, Adler was sophisticated, it was Adler's own practice to apparently keep some invoices but the lack of a complete set of invoices was not explained, and the records and ledgers were generalized.

Finally, as to whether Adler concealed the fourteen boxes in the garage, the Court finds nothing erroneous about the Bankruptcy Court's holding. The Bankruptcy Court's focus in analyzing discharge under Section 727(a)(3) was not on whether Adler concealed the documents, but rather on Adler's credibility. The Bankruptcy Court appropriately noted that the

records were kept in Adler's garage, even citing to precedent to support the proposition that "a debtor's delay cannot be easily excused as to records that were kept in a basement and in two filing cabinets, regardless of whether he claims to have otherwise thoroughly searched for such records." July Order, 494 B.R. at 72 (quoting In re Shah, 388 B.R. 23, 37 (Bankr. E.D.N.Y. 2008)).  This finding is fully supported by precedent, and this Court could find nothing to question the Bankruptcy Court's ruling in this regard.  See In re Mitsopoulous, 487 B.R. at 612 (holding that the debtor cannot simply inundate the judge and trustee with documents to sift through).

Accordingly, Adler's appeal as to Section 727(a)(3) is DENIED.

3. Section 727(a)(5)

Adler next appeals the Bankruptcy Court's decision denying him a discharge under Section 727(a)(5).  Section 727(a)(5) provides that "the court shall grant the debtor a discharge, unless the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5).

Adler's appeal as to Section 727(a)(5) relies primarily upon Portnoy's testimony, arguing that Portnoy testified that the Corporations were operated properly as

corporations in the garment industry and that there was no loss of assets from the Corporations. (Adler's Appellant Br. at 46.) "Michael Portnoy's uncontroverted testimony demonstrated that the Corporations suffered over a million dollar loss, and that he came to this conclusion through his review of the check stubs which he compared to a large amount of actual checks." (Adler's Appellant Br. at 47.)

Plaintiffs argue that Adler mischaracterizes Portnoy's testimony. (Pls.' Opp. Br. at 33.) Specifically, Portnoy admitted that he relied upon incomplete evidence. (Pls.' Opp. Br. at 33.) Moreover, Portnoy's testimony was not "uncontroverted" because it was challenged on cross-examination and by the Court. (Pls.' Opp. Br. at 34.)

The Bankruptcy Court relied on Adler and Portnoy's testimony, citing not only to the testimony, but extracting exact quotes. July Order, 494 B.R. at 74. In fact, the Bankruptcy Court accurately noted--as a review of the trial transcripts reveals--that Portnoy listed a number of ways in which the financial documentation for the Corporations was incomplete. Thus, despite Adler's arguments pointing the Court to certain aspects of Portnoy's testimony, the portions quoted by the Bankruptcy Court are uncontested. The Bankruptcy Court did not necessarily dispute that the Corporations may have experienced some loss, nor did it even discuss in this context

whether the Corporations operated in a manner typical in the garment industry. Rather, the Bankruptcy Court found that, when pressed, neither Adler nor Portnoy could provide any substantial details or corroborating evidence to substantiate Adler's explanation for losses. Id. at 74.

While the "[d]ebtor's explanation need not necessarily be meritorious, . . . it must be a good faith explanation of what really happened to the assets in question." In re Russell, 507 B.R. at 797 (internal quotation marks and citations omitted). Vague and uncorroborated assertions such as Adler suggests are insufficient. See In re Young, 346 B.R. 597, 618 (Bankr. E.D.N.Y. 2006) (The debtor's account "must be more than a 'vague, indefinite, and uncorroborated hodgepodge of financial transactions.'") (quoting Schechter v. Hansen (In re Hansen), 325 B.R. 746, 763 (Bankr. N.D. Ill. 2005)); In re Handel, 266 B.R. 585, 590 (Bankr. S.D.N.Y. 2001) ("Vague and indefinite explanations of losses that are based upon estimates, uncorroborated by documentation, are unsatisfactory." (internal quotation marks and citation omitted)).

Accordingly, Adler's appeal in this regard is DENIED.

4. Section 727(a)(4)(A)

Adler also appeals the Bankruptcy Court's denial of discharge pursuant to Section 727(a)(4)(A). Section 727(a)(4)(A) provides: "(a) The Court shall grant the debtor a

discharge unless . . . (4) the debtor knowingly and fraudulently, or in connection with the case (A) made a false oath or account." 11 U.S.C. § 727(a)(4)(A).

Adler asserts that any mistakes or omissions in his Petition were the result of an honest mistake. (Adler's Appellant Br. at 43.) He maintains that he relied on his attorney to properly prepare and file his Petition and that he fully disclosed everything at the Section 341 meeting. (Adler's Appellant Br. at 43.) He also asserts that he provided a large number of documents with all of the information and that that information was included in the Petition, even if in the wrong place. (Adler's Appellant Br. at 44.)

Plaintiffs argue that Adler does not dispute the Bankruptcy Court's factual findings, but rather asserts the same self-serving statements and arguments that he made before the Bankruptcy Court. (Pls.' Opp. Br. at 38.) "In sum, the record at trial established that the Debtor knowingly made a false oath and account and did not rebut the inference of fraudulent intent raised by the numerous inaccuracies and omissions in his petition." (Pls.' Opp. Br. at 39.)

The Bankruptcy Court held that Plaintiffs satisfied their burden on the Section 727(a)(4)(A) analysis. In response to questions in the Petition, the schedules, and the Statement of Financial Affairs, Adler failed to list critical data about

his financial affairs including: his wife's account; income from certain years; his ownership stake in the Corporations; and his status as a defendant in a state court proceeding. July Order, 494 B.R. at 75. Adler also selectively chose when to include information regarding the Corporations. Id. at 76. The Bankruptcy Court ultimately concluded that Adler provided an "incomplete and inaccurate picture of his financial affairs," and therefore that Plaintiffs met their initial burden. Id. at 77.

As to the remaining portion of the analysis, the Bankruptcy Court recognized that the advice of counsel may sometimes provide a plausible defense to an inaccurate or false oath, but that it would not protect a debtor where it was plain that the property should be scheduled. Id. at 78. The Court rejected the defense of reliance on counsel because Adler was a sophisticated businessman who chose and understood factor financing. Moreover, Adler chose to list information about the Corporations when helpful to him and omit information when it was not beneficial. Id. The omitted information was information within Adler's knowledge, such as whether he earned income, had been employed, was an officer of a corporation, etc. Id. at 79. Finally, the Bankruptcy Court concluded that Adler had essentially provided only self-serving explanations without any supporting evidence. Id.

> To prove an objection to discharge under
> § 727(a)(4)(A), the party objecting to
> discharge must establish by a preponderance
> of the evidence that: "(1) the debtor made a
> statement under oath; (2) the statement was
> false; (3) the debtor knew that the
> statement was false; (4) the debtor made the
> statement with intent to deceive; and (5)
> the statement related materially to the
> bankruptcy case."

Bub v. Rockstone Capital, LLC, No. 14-CV-0546, 2014 WL 2882613, at *6 (E.D.N.Y. June 25, 2014) (quoting In re Moreo, 437 B.R. 40, 59 (Bankr. E.D.N.Y. 2010)). If the moving party has met its burden, "the burden of production then shifts to the debtor[] to produce a credible explanation for making the false and fraudulent representations, or to prove that it was not an intentional misrepresentation." Id. at *7 (internal quotation marks and citations omitted) (alteration in original).

Adler appeals the Bankruptcy Court's determination that the false statements or omissions were made with the requisite intent and that Adler did not carry his burden of production. In doing so, Adler asserts that he relied upon his counsel and that he provided much of the information. Here, however, Adler was a sophisticated businessman, educated enough to understand the petition and information that he approved of within the bankruptcy petition. See Bub, 2014 WL 2882613, at *11 ("It is evident that debtor, who had business experience and at least some financial sophistication, repeatedly made material

omissions and misrepresentations in his bankruptcy petition, schedules, and other submissions to the Bankruptcy Court.") Moreover, one's reliance on counsel does not equate to absolute entitlement to a discharge. See In re Gobindram, No. 11-75802, 2014 WL 2809078, at *7 (Bankr. E.D.N.Y. June 20, 2014). Where, as here, a brief review of the bankruptcy documents would have revealed to Adler that there were material omissions, advice of counsel will not overcome the inference of fraudulent intent. Id. at *7-8.

Ultimately, the Bankruptcy Court's determination that Adler was not credible is entitled to deference. See Bub, 2014 WL 2882613, at *11. Nonetheless, even without such deference, this Court comes to the same conclusion. Accordingly, Adler's appeal in this regard is DENIED.

III. Plaintiffs' Appeal

Plaintiffs appeal the Bankruptcy Court's August 26, 2013 Order, in which the Bankruptcy Court determined--for the reasons articulated in the July Order--that the automatic stay pursuant to 11 U.S.C. § 362(a) applied to the Corporations, rendering Plaintiffs' post-petition judgment in their favor void ab initio.

By its terms, Section 362 applies only to actions against debtors, debtor's property, or estate property, and does not stay proceedings against non-debtors. But in A.H. Robins

Co., Inc. v. Piccinin ("Robins"), the Fourth Circuit held that Section 362 could be extended to enjoin civil proceedings against non-debtors in "unusual circumstances." 788 F.2d 994, 999 (4th Cir. 1986). Likewise, in Queenie Ltd. v. Nygard International ("Queenie"), the Second Circuit held that "the automatic stay can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." 321 F.3d 282, 287 (2d Cir. 2003). The Second Circuit then provided several "examples" of such an immediate adverse impact: (1) "a claim to establish an obligation of which the debtor is a guarantor"; (2) "a claim against the debtor's insurer"; and (3) quoting, Robins, "'actions where there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant.'" Id. at 288-89.

Plaintiffs raise several issues for appeal regarding the Bankruptcy Court's decision and its application of Queenie. The Court will address each such issue in turn.

A. The Bankruptcy Court did not Ignore the Standard

Initially, Plaintiffs maintain that the Court erred because, while it cited to Queenie's language of "immediate adverse economic consequences," it failed to consider immediacy or whether there would be adverse consequences to Adler's estate. Rather, the Bankruptcy Court apparently relied on the

fact that the corporate veils were pierced to conclude that Queenie's standard was met.[3]

Certainly, Plaintiffs are correct that the Bankruptcy Court stated that the standard "has been construed to include any perceptible economic harm to a non-party debtor's tangible or intangible property interest . . . ." In re Adler, 494 B.R. at 57. Such a statement, taken in isolation, does indeed suggest a diversion from consideration of the impact on the debtor's estate. Nonetheless, the Bankruptcy Court went on to find that the critical issue here is that the corporate veils had been pierced. The Court held that "if two judicial determinations have been made--(1) one or more non-debtor corporations has been found liable for a prepetition debt on a cause of action asserted in a post-petition proceeding, and (2) the veil between these corporate alter egos and the non-party debtor has been pierced--the § 362(a)(1) stay was violated by

---

[3] Plaintiffs' recitation of the issues also seems to suggest that the Bankruptcy Court erred in considering the extension of the automatic stay sua sponte. (See Pls.' Appellant Br., Docket Entry 9, at 1.) However, Queenie itself raised this issue sua sponte, and the Court can find no prohibition against such. See Queenie, 321 F.3d at 287 ("Preliminarily, we consider whether the automatic stay, 11 U.S.C. § 362(a), which requires a stay of this appeal with respect to Gardner, applies to the appeals of the other Appellants. We requested the parties' views on the stay issue . . . ."); In re Ladieu, No. 07-10868, 2011 WL 748566, at *18 (Bankr. D. Vt. Feb. 24, 2011) ("Although Ladieu did not specifically raise the issue of the automatic stay, the Court may raise the issue of the stay sua sponte and it is necessary in this case given the timeline of events).

the post-petition proceeding." Id. at 58. Thus, given that these were "precisely the facts" before the Bankruptcy Court, it found that the State Court judgment in Plaintiffs' favor was void ab initio. Id.

Such an analysis is fully in compliance with precedent, and in fact is almost identical to Queenie. In Queenie, the Second Circuit held that, under the principles and standards it had set out, "the stay applies to Queenie because it is wholly owned by Gardner, and adjudication of a claim against the corporation will have an immediate adverse economic impact on Gardner." Queenie, 321 F.3d at 288. In other words, where the individual--Gardner--had filed for bankruptcy, the stay should be extended to his wholly owned corporation-- Queenie. Contrary to Plaintiffs' implications, the Second Circuit neither defined "immediate" nor provided any detailed consideration of the consequences on the debtor's estate. Rather, the relationship between the parties was sufficient to meet the standard.

Courts have regularly considered piercing the corporate veil or the relationship between the parties in analyzing whether the automatic stay should be extended to a non-debtor. See, e.g., In re Ladieu, 2011 WL 748566, at *19 ("Ladieu is the sole member of Galadieu, and under the facts presented, this creates such an identity between Ladieu and

Galadieu that a judgment for Rentreak against Galadieu for default under the Agreement would be a judgment in favor of Rentreak against Ladieu."); M.E.S., Inc. v. M.J. Favorito Elec., Inc., No. 08-CV-0183, 2010 WL 959604, at *2 (E.D.N.Y. Mar. 15, 2010) (finding that there was "no reason to distinguish this case from Queenie" because it was undisputed that debtors wholly owned the corporations to which the automatic stay was sought to apply). In performing such analyses, whether the debtor would become liable for a prepetition debt and the timeline of events is important. Contrary to Plaintiffs' assertion, the Bankruptcy Court was fully correct in finding that Adler's liability here attached prepetition. The Bankruptcy Court's Piercing Order indeed looked at the facts across a period of time. However, the Bankruptcy Court also noted that all of the Corporations were incorporated prepetition and that, "[d]ue to his prepetition position as his Corporations' alter ego, for each prepetition obligation that these dummies incurred, the Debtor was always individually liable . . . ." July Order, 494 B.R. at 58-59.

Accordingly, Plaintiffs' appeal insofar as it asserts that the Bankruptcy Court erroneously ignored the proper requirements and standard is DENIED.

B. <u>The Bankruptcy Court Did Not Fail to Make Factual Findings</u>

Plaintiffs further seek appeal because, they maintain, the Bankruptcy Court failed to make the requisite factual findings to substantiate its conclusion that the "immediate adverse economic consequences" standard was satisfied. This Court disagrees.

In making this argument, Plaintiffs rely exclusively on <u>In re Residential Capital, LLC ("ResCap")</u>, 529 F. App'x 69 (2d Cir. 2013) and its subsequent history. Specifically, Plaintiffs maintain that "[t]he Second Circuit made clear, in <u>ResCap</u>, that the application of Section 362(a)'s automatic stay to a pending lawsuit against non-debtors requires 'factual findings' showing that the lawsuit against those entities would have 'immediate adverse economic consequences' on the debtor's estate." (Pls.' Appellant Br., at 15.) In that case, the Second Circuit remanded the District Court's decision because the District Court denied application of the automatic stay pursuant to Section 362(a) "as a categorical matter, without factual findings as to whether the lawsuit against [the non-debtor] entities would have had 'immediate adverse economic consequence[s]' on ResCap's estate." 529 F. App'x at 71.

On remand, the District Court issued a brief order, finding that third party discovery would not impose an immediate

adverse economic consequence on ResCap's estate and otherwise rejecting ResCap's arguments. Neither the Second Circuit's opinion nor the decision on remand define "factual findings" or specify the level of detail necessary for a proper analysis.

In any event, contrary to Plaintiffs' assertion and unlike in ResCap, the Bankruptcy Court's decision was not generalized nor decided in a vacuum. Rather, the Bankruptcy Court explicitly referenced its decision and findings in the Piercing Order. See July Order, 494 B.R. at 53 ("The first consequence of the Piercing Ruling arises under § 362(a)(1). As the Debtor and the alter ego Corporations were at all relevant times one and the same entity, the automatic stay in § 362(a)(1) foreclosed any judicial action against the Debtor and the Corporations alike upon the Debtor's filing of his individual bankruptcy petition on July 28, 2004."). Specifically, the Court noted its holdings in the Piercing Order and found that

> because the last of the five Corporations was incorporated prepetition, the Debtor and every alter ego Corporation cannot be regarded as anything but a single true entity in the years preceding the Petition date . . . . Due to his prepetition position as his Corporations' alter ego, for each prepetition obligation that these dummies incurred, the Debtor was always liable, whether directly or indirectly.

Id. at 58-59 (internal citations omitted).

Thus, even assuming that ResCap placed a universal requirement of factual findings in order to extend the automatic stay pursuant to Section 362(a), the Bankruptcy Court apparently fulfilled this obligation. This Court could not find any further precedent setting out a black-letter standard in this regard, and the Bankruptcy Court's decision falls perfectly within the parameters of prior cases. Accordingly, Plaintiffs' appeal in this regard is DENIED.

C. Identity of Interest

Finally, Plaintiffs appeal the portion of the Bankruptcy Court's decision subtitled "Response to Plaintiffs' Arguments as to Queenie." July Order, 494 B.R. at 59-61. Their appeal in this regard is two-fold. First, Plaintiffs maintain that the Bankruptcy Court erroneously held that the "identity of interest" illustration from the Robins case can satisfy Queenie's "immediate adverse economic consequence" requirement. (Pls.' Appellant Br. at 22.) In this regard, Plaintiffs primarily assert that Queenie and its progeny dictate that the standard does not apply in cases involving Chapter 7, as opposed to Chapter 11, debtors. Second, the Bankruptcy Court erroneously held that the Queenie standard did not apply because when Plaintiffs proceeded against the Corporations, they advanced against Adler. (Pls.' Appellant Br. at 26.) Neither argument is availing.

The Bankruptcy Court specifically noted--and rejected—
Plaintiffs' contention that Queenie's reach is limited to cases
involving a Chapter 11 debtor where an action would have an
immediate adverse economic consequence on the debtor's
reorganization.  July Order, 494 B.R. at 59.  This Court has
conducted its own de novo review in this regard.  Certainly,
Plaintiffs are correct in citing to a number of cases in which
courts have not extended Queenie to cases involving Chapter 7
debtors.  (Pls.' Appellant Br. at 24-25 (collecting cases).)
Those cases indeed hold that there must be an adverse economic
impact upon the debtor's reorganization.  See, e.g., Capitol
Records, Inc. v. MP3tunes, LLC, No. 07-CV-9931, 2012 WL 2389751,
at *1 (S.D.N.Y. June 25, 2012) ("Indeed, because MP3 tunes seeks
liquidation under Chapter 7, and not reorganization under
Chapter 11, Robertson cannot articulate how continuing this
action against him could affect MP3tunes' ability to
reorganize."); Uto v. Job Site Servs., Inc., 444 B.R. 222, 224
(Bankr. E.D.N.Y. 2011) ("Here, the same risk [of an immediate
adverse economic consequence] does not appear to be indicated
because . . . O'Shea is liquidating--as per Chapter 7 of the
Bankruptcy Code--and therefore there is no risk to any
reorganization." (internal quotation marks and citations
omitted)).

Nonetheless, the Court can find no such requirement in _Queenie_.  _Queenie_ simply requires an immediate adverse economic impact on the debtor's estate, without regard to whether the debtor filed for bankruptcy under Chapter 11 or any other chapter.  In fact, _Queenie_ cited to _Robins_ when it stated that one example of an immediate adverse economic consequence is "an action[] where there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant."  _Queenie_, 321 F.3d at 288 (internal quotation marks and citation omitted).  It is not clear how, as Plaintiffs suggest, the Bankruptcy Court "misinterpreted" _Queenie_ and _Robins_.  _Robins_ specifically stated that one example of where there would be an "unusual situation" justifying extension of the automatic stay is when there is such identity between the debtor and third-party that the debtor is the real party defendant.  _Robins_, 788 F.2d at 999.  Similarly, _Queenie_ provided three examples of when extension is appropriate, providing identity as one such example.  _Queenie_, 321 F.3d at 287-88.  There is no way to read these statements other than how the Bankruptcy Court read them--if the debtor is the real party defendant, the automatic stay should apply.  _July Order_, 494 B.R. at 60.

Moreover, despite the number of cases limiting _Queenie_ to Chapter 11, still others have applied it to contexts other

than Chapter 11. See, e.g., In re Ladieu, No. 07-10868, 2011 WL
748566, at *18-19 (Bankr. D. Vt. Feb. 24, 2011) (finding that
the automatic stay applied to the Chapter 7 debtor's
corporation); M.E.S., Inc. v. M.J. Favorito Elec., Inc., 2010 WL
959604, at *2 & n.3 (addressing a Chapter 13 case and noting
that the Court could find "no basis for interpreting § 362(a)(1)
differently depending on the form of bankruptcy protection the
debtor has applied for, or limiting Queenie's reach to
corporations, as opposed to LLCs")). Simply put, the case law
in this area is unclear at best and this Court can find no
reason as to why the automatic stay should not be extended in
this instance, where the facts are strikingly analogous to those
in Queenie.

In any event, the Bankruptcy Court took its analysis
one step further, finding that, in effect, "[w]hen the
Plaintiffs proceeded against the Corporations collectively in
the New York State Supreme Court, they advanced not against a
'non-debtor,' as in Queenie or Robins, but against the Debtor,
the sole party in interest in that suit." July Order, 494 B.R.
at 59 (emphasis in original). In essence, this holding goes
part and parcel with Robins' and Queenie's real party defendant
illustration.[4] It is neither novel nor unprecedented, as several

---

[4] The Court does not agree with Plaintiffs' contention that the
only support for this proposition is Judge Grossman's prior

cases in this Circuit have held similarly. See In re Ladieu, 2011 WL 748566, at *19 ("Ladieu is the sole member of Galadieu, and under the facts presented, this creates such an identity between Ladieu and Galadieu that a judgment for Rentrak against Galadieu . . . would be a judgment in favor of Rentreak [sic] against Ladieu."); In re Ames Dep't Stores, Inc., No. 06-CV-5394, 2008 WL 7542200, at *7 (S.D.N.Y. June 4, 2008) ("[J]ust as the LFD-Ames action would clearly be subject to the protection of the automatic stay, so would the LFD-GECC action."); In re Northwest Airlines Corp., No. 05-17930, 2006 WL 2583647, at *3 (Bankr. S.D.N.Y. Aug. 28, 2006) ("[I]t seems clear that the action is really against the Debtors . . . . This is thus one of these rare cases where there is such identity of interests between a debtor and a third party that the stay unquestionably applies.").

[BOTTOM OF PAGE INTENTIONALLY LEFT BLANK]

---

decision in In re Pitts, No. 808-74860, 2009 WL 4807615 (Bankr. E.D.N.Y. Dec. 8, 2009) and a bankruptcy case from the District of West Virginia. (Pls.' Appellant Br. at 26.)

Accordingly, Plaintiffs' appeal in this regard is also DENIED.[5]

CONCLUSION

For the foregoing reasons, Plaintiffs' appeal and Adler's appeal are both DENIED and the Bankruptcy Court's holdings are AFFIRMED. The Clerk of the Court is directed to mark this matter CLOSED.


SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     September __24__, 2014
           Central Islip, NY

---

[5] To the extent that Plaintiffs maintain that "[t]he practical implications of the Bankruptcy Court's holding would be a disaster of gargantuan proportions for our judicial system," the Court rejects this argument. (Pls.' Appellant Br. at 27.) The Bankruptcy Court's opinion is based upon precedent, primarily Robins and Queenie, which have been in effect for decades.